The **PEOPLES NATIONAL BANK, KING-FISHER, OKLAHOMA,** successor by merger to First National Bank of Geary, Plaintiff,

v.

**The UNITED STATES, Defendant.**

**No. 92–879 C.**

United States Court of Federal Claims.

Feb. 4, 1994.

---

John N. Hermes, Oklahoma City, OK, of record for plaintiff.

Luis M. Matos, with whom were Asst. Atty. Gen. Frank W. Hunger, Director David M. Cohen, Asst. Director Jeanne E. Davidson, Dept. of Justice, Washington, DC, and Robert L. Huddle, Dept. of Agriculture, Stillwater, OK, for defendant.

## OPINION

WIESE, Judge.

Plaintiff is a financial institution whose predecessor in interest, the First National Bank of Geary, Oklahoma (the bank), was the originating lender on certain farm loans guaranteed by the Farmers Home Administration (FmHA). In conjunction with the issuance of the FmHA loan guarantees, the parties (FmHA and the bank) executed a "Lender's Agreement" whose terms included a provision for the allowance, in the event of loan liquidation, of "[c]ertain reasonable liquidation costs ... [to] be deducted from gross proceeds [received by the lender] from the disposition of collateral." The principal question we encounter in this case is whether the phrase "reasonable liquidation costs" includes attorneys' fees incurred by the bank in its defense of lender liability actions brought against it by the debtors-in-default. What brings the question to the fore is that liquidation costs, to the extent allowed, represent reimbursements to the lender that, on the one hand, reduce the net amount creditable against the sale of loan collateral and, on the other, increase the loan guarantor's liability by a like amount. Based on the arguments of counsel, as set forth in written cross-motions for summary judgment supplemented by oral argument, we conclude that the attorneys' fees in question are not part of reasonable liquidation costs under the FmHA's lender's agreement.

### Facts

In 1986, FmHA agreed to guarantee, as part of a loan arrangement between the bank and its borrowers (Orval and Barbara Cowan—husband and wife), eighty percent of two farm operating loans totalling $400,000. These loans, evidenced by promissory notes 327 and 328, were secured by a second mortgage on the Cowans' homestead, a first mortgage on certain mineral interests and a first priority security interest in farm equipment and machinery, livestock, crops, vehicles and certain other collateral.

As noted, issuance of the loan note guaranties was accompanied by the parties' execution of a lender's agreement—a document that set forth the terms of the FmHA guaranties and, in particular, the lender's responsibilities in respect to the administration of the loans and the protection of their collateral. The lender's agreement provided, inter alia, that in the event of the borrower's default, liquidation of the loan, if agreed to by FmHA, would be undertaken by the lender. With respect to the costs involved in a liquidation, the lender's agreement stated:

I. *Liquidation Costs.* Certain reasonable liquidation costs will be allowed during the liquidation process. The liquidation costs will be submitted as a part of the liquidation plan. Such costs will be deducted from gross proceeds from the disposition of collateral unless the costs have been previously determined by the lender (with FmHA written concurrence) to be protective advances. If changed circumstances after submission of the liquidation plan require a revision of liquidation costs, the Lender will procure FmHA's written concurrence prior to proceeding with the proposed changes. No in-house expenses of the Lender will be allowed. In-house expenses include, but are not limited to, employees' salaries, staff lawyers, travel and overhead.

7 C.F.R. part 1980, subpt. A, app. B at 549 (1993).

In July of 1987, the Cowans defaulted on notes 327 and 328. Thereupon the bank, acting in accordance with an FmHA-accepted liquidation plan, prepared to file a foreclosure action against the Cowans. The Cowans, however, got to the courthouse sooner. To forestall the foreclosure action, they filed a multi-count complaint charging the bank with a variety of wrongdoings including breach of contract, breach of fiduciary duty, wrongful interference in business relations, and fraud—all in respect to a course of dealing with the bank extending over a five-year period that culminated in three loan transactions in 1986 involving a total borrowing of $600,000. (Of these three loans, two were covered by FmHA guaranties; they are the subject of this lawsuit.) In their lawsuit, the Cowans sought compensatory as well as punitive damages; additionally, they asked for the cancellation and rescission of the loan agreements based on an alleged failure of consideration. The bank promptly filed an answer to the complaint and included a counterclaim seeking foreclosure on the notes.

Litigation proved long and costly. At the bank's request, the state court appointed a receiver to prevent the debtors from dissipating the collateral. Thereafter, various other claimants, including the Federal Deposit Insurance Corporation, asserted conflicting claims of priority in the collateral. The resolution of these conflicting demands necessitated removal of the action to a federal district court. Following completion of the district court litigation, the parties returned once again to the state court—this time for a nine-day trial. There a jury rendered a verdict for the bank on the two FmHA guaranteed loans but found in favor of the Cowans on the third loan in issue on the ground that there had been no default.

Both sides appealed. While the cross-appeals were pending before the Oklahoma Supreme Court, the parties came to a settlement. By the terms of this settlement, the Cowans acknowledged liability on all the notes in issue and accepted, as well, liability for attorneys' fees and costs of $227,943.53—an amount which they stipulated to be reasonable.

The settlement agreement was adopted by the trial court as the basis for its entry of judgment. However, when the bank sought to collect on the judgment, the Cowans filed for bankruptcy and, in so doing, obtained an automatic stay of execution. The stay was lifted after the Cowans failed to make the first payment due under the plan of reorganization that had been confirmed by the bankruptcy court. More litigation then followed. Ultimately, however, the bank prevailed and thereby gained the right to go forward with the plan of liquidation. Eventually, the bank recovered $656,432.85 from the sale of loan collateral.[1]

On August 10, 1990, some three years after the litigation first began, the bank filed an interim claim of loss with FmHA seeking payment on the loan losses suffered through that date. Included in the calculation of the loss amount was a claim for the deduction of $273,451.25 in attorneys' fees, identified as a cost of carrying out the liquidation. The deduction, in effect, increased FmHA's exposure under the loan guaranties by correspondingly reducing the amount of liqui-

---

1. By the time liquidation was concluded, interest on the unpaid loans was approximately $250,- 000.00.

dation proceeds creditable against the unpaid loan balances.

The FmHA rejected the entirety of the bank's claim. With regard to that part of the Bank's claim relating to attorneys' fees, the Agency's state director expressed the view that the fees represented a cost largely unrelated to the liquidation process. The state director's decision letter, dated October 24, 1990, explains:

It would appear that the majority of the $273,451.25 in attorney fees were incurred as the result of the bank defending itself against lender liability charges. We feel that reasonable and customary legal fees in this instance would have been 10 percent of the unpaid balance or $37,440.00.

The bank appealed the denial of its claim to FmHA's National Appeals Staff. The appeal was favorable to the bank on all contested issues save for the matter of attorneys' fees. On that score, the hearing officer did, however, increase the amount allowable from ten percent of the principal balance that remained outstanding on the two FmHA guaranteed notes to fifteen percent.

Following this decision, the bank sought review before the Director of the National Appeals Staff. On December 12, 1991, that Office issued a determination rejecting the bank's claim and reinstating the state director's initial allowance of ten percent. The national director's determination was based on the fact that "most of the fees were spent in defense of the lender liability allegations" and, as such, represented a separate element of cost not assignable to FmHA's guaranties.

On November 22, 1991, a few weeks prior to the issuance of the final administrative decision by the Director of the National Appeals Staff, the bank filed its final report of loss based on the results of its now-completed liquidation efforts. In this report, the bank sought recovery of attorneys' fees and costs in the revised amount of $307,703.78. On February 11, 1992, the state director, acting in accordance with the Agency's previously expressed views on this issue, allowed the claim to the extent of $40,825.56, that is, ten percent of the unpaid loan principal. The remainder of the claimed deduction was denied. At this time the bank was also advised that, inasmuch as the National Appeals Staff had previously addressed the fee issue, no further appeal would lie. In other words, the issue was now administratively final. Thereafter, suit was brought in this court.

The bank's contention is that, based on the terms of FmHA's loan note guaranties, the unrecovered attorneys' fees remain due and owing. Accordingly, the bank seeks judgment in the amount of $213,502.58 plus interest.

## Discussion

■ A contract of guaranty involves a promissory undertaking in which a party (the guarantor), agrees to fulfill an obligation owed to another (the obligee) upon default of the principal obligor. Restatement (Third) of Suretyship § 12(a), § 1 comment c (Tentative Draft No. 1, 1992). "A guarantor promises to answer for the payment of a debt or the performance of an obligation on default of such payment or performance by a third person." Arthur A. Stearns & James L. Elder, *The Law of Suretyship* § 4.1 (Greenwood Press 1972) (5th ed. 1951). In present-day terminology, the guarantor is referred to as the "secondary obligor." Restatement (Third) of Suretyship §§ 1, 12 (Tentative Draft No. 1, 1992).

With this brief introductory note as background, we go directly to the question at hand: does FmHA's liability as a secondary obligor extend to and include liability for the attorneys' fees which the bank incurred in defense of the Cowans' suit? It is not disputed that, under the terms of the lender's agreement, attorneys' fees directly associated with the foreclosure of a borrower's collateral—for example, legal fees connected with the preparation of documents authorizing transfers of title—would qualify as deductible expenses. The bank contends, however, that liquidation costs must include all legal costs reasonably incurred in its contest with the Cowans since those costs were no less necessary to the eventual liquidation than the more immediate costs incurred in a foreclosure action.

The court cannot agree with this argument. Contracts of guaranty, like contracts

in general, are to be read and understood in accordance with the ordinary and everyday meaning of the words they employ unless, of course, the language of the agreement specifies otherwise. Restatement (Third) of Suretyship § 11 (Tentative Draft No. 1, 1992). Thus, when the lender's agreement specifies that, upon the borrower's default, the lender may pursue a number of actions including, with FmHA's written concurrence, "liquidation," we must assume that word is being used in its normal business sense.

In a business context, "liquidation" refers to the "settling of financial affairs . . . usually by . . . turning to cash . . . all assets for distribution to creditors, heirs, etc." *Black's Law Dictionary* 931 (6th ed. 1990). More particularly, where a loan transaction is involved, FmHA's regulations define liquidation as "[t]he act of selling security . . . to close the loan when no further assistance will be given; or instituting civil suit against a borrower to recover security." 7 C.F.R. § 1962.4 (1993). Placing these definitions into the framework of the lender's agreement identifies liquidation as a lender's right, arising upon the borrower's default, to terminate the loan contract and reduce its collateral to cash. Liquidation, then, is a remedy for breach; as such, it assumes the existence of a valid and enforceable loan arrangement.

The litigation that embroiled the bank and its borrowers was not concerned with the enforcement of a contract remedy. Rather, that litigation was taken up with a far more basic question: whether there was any enforceable loan contract at all. The Cowans maintained that the loan agreements were void because of the bank's alleged fraud, deceit and duress in issuing the loans and, based on these grounds, sought their cancellation. Had the Cowans prevailed, the bank's loan rights would have been extinguished. And so too would FmHA's guaranty obligation because that obligation was predicated, in the first instance, on the existence of a valid loan agreement. Absent the existence of a loan agreement enforceable against the Cowans, the bank would have no basis for a claim against FmHA. "The purpose of the secondary obligation is to stand behind the obligation of the principal obli-

gor. . . . It is not the purpose of the secondary obligation to assure the obligee of performance to which it is not entitled pursuant to its contract with the principal obligor." Restatement (Third) of Suretyship § 30 comment a (Tentative Draft No. 2, 1993).

■ Given then that the bank's right to recovery of its legal fees would not have survived cancellation of the Cowan loans, there can be no basis now for labeling those fees "liquidation costs." Liquidation costs may only be understood to refer to those administrative and legal expenses (including attorneys' fees) that are incurred in obtaining authorization for and in conducting a sale of a debtor's collateral and in accomplishing the transfer of title and possession of that collateral to a new owner. The fees at issue here were not incurred for these purposes. Rather, they represented legal expenses the bank was forced to incur in order to affirm the validity and enforceability of its loan agreements. Thus, the fees related to the matter of contract liability and not contract remedy. Accordingly, the bank is not entitled to recover the fees that it seeks because they are not liquidation costs.

■ There is a second aspect to the bank's claim that needs to be addressed. The bank contends that even if it is to be denied the principal relief that it is seeking here, still it is entitled to recover more in attorneys' fees than the ten percent allowance which FmHA recognized as an element of reasonable liquidation costs. The argument has a number of parts but essentially what it comes down to is the contention that FmHA erred, both procedurally and substantively, in accepting, as the basis for decision, the advice of its regional counsel that "[t]he normal and customary attorney fees on straight foreclosure action run from 10–15% of the amount sued for."

The quoted statement—part of an advisory letter addressing the bank's proof of claim that FmHA's Office of Counsel had forwarded to the state director's office on February 9, 1990—was later adopted by the state director as the basis for his decision on the bank's claim for attorneys' fees. The FmHA's subsequent decisions on the bank's claims—the decisions of the hearing officer

and the reviewing officer—adhere to the position that the usual and customary method of determining attorneys' fees in a foreclosure action is to base the fees on a percentage of the amount in issue.

The bank contends this approach is wrong. First, the bank argues that it was inappropriate for the state director, as well as for the subsequent reviewing authorities, to rely on the advice of Agency counsel since that advice did not stem from an independent source. As the bank sees it, the advice of an Agency employee must be considered biased and, on that account, may not be regarded as credible.

As a second argument, the bank contends that a percentage approach to attorney fee determination violates FmHA's own regulations which define the reasonableness of liquidation costs in terms of the "prevailing rate charged in the area for like services." 7 C.F.R. § 1980.146(c). This standard, the bank maintains, demands adherence to the so-called "lodestar" approach to fee determination in which the base costs of legal work (hours expended times average hourly rate) are adjusted in recognition of unique elements in the work such as the level of skill demanded, the complexity of the legal task, the quality of the work performed, and the extent of the results achieved. It is pointed out that the lodestar approach to fee determination is the standard applicable in the State of Oklahoma (the state in which the loans were executed and performed) and should therefore have been followed by FmHA in deciding the bank's claim.

We cannot heed these arguments. Certainly the state director was entitled to rely on the advice given him by Agency counsel since that, after all, is the very reason for such counsel—to provide legal guidance to the administrative personnel charged with carrying out the Agency's mission. And if, as now claimed, that advice was wrong, then the bank had every opportunity to undo it. The advisory letter was part of the record before the hearing officer; it was up to the bank at that point to demonstrate, *through its own proof*, that the advisory letter was incorrect. The bank, however, did not do so. Rather, it restricted its evidentiary presentation before the hearing officer to its principal claim—the contention that legal fees were reimbursable *in toto* because all had been incurred in an effort to sustain the validity of the loan agreements and to preserve the bank's right of liquidation. Only now, before this court, does the bank, for the first time, attempt to argue in favor of a fall-back position.

The effort comes too late. As a reviewing court, we cannot fault an agency decisional process whose results are not inconsistent with the record before it. In this case, that record leaves unassailed the proposition that, in foreclosure proceedings, normal and customary attorneys' fees range from ten to fifteen percent of the loan principal remaining unpaid. Since FmHA's final decision is supported by the evidence, the decision must stand.

### Conclusion

For the reasons given, plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted. The Clerk shall enter judgment dismissing the complaint.